### BAUMANN *v.* POST.

(*Common Pleas of New York City and County, General Term.* December 1, 1890.)

1. WAREHOUSEMAN—LIEN—MORTGAGED CHATTELS.
> Laws N. Y. 1885, c. 526, § 1, (4 Rev. St., 8th Ed., p. 2519,) which provides that "a warehouseman, or person lawfully engaged exclusively in the business of storing goods, wares, and merchandise for hire, shall have a lien for his storage charges, * * * and it shall be lawful for him to detain said goods until such lien is paid," does not give a warehouseman a lien on goods stored with him by a mortgagor thereof after default in payment of the money secured by the mortgage, as against the mortgagee whose right to the possession of the mortgaged goods became absolute on such default. Distinguishing *Stallman* v. *Kimberley,* 6 N. Y. Supp. 706.

**2. SAME—PRIORITY OF LIEN—PUBLIC POLICY.**
> A warehouseman's lien will not be given precedence of a prior chattel mortgage as a matter of public policy.

**3. CHATTEL MORTGAGES—POSSESSION OF MORTGAGOR AFTER DEFAULT.**
> A mortgagor of chattels who is in possession of the chattels after default in the mortgage, does not hold them as agent or bailee of the mortgagee, whose right to possession has become absolute by the default, and such mortgagor, by storing the chattels with a warehouseman, cannot bind the mortgagee for the storage charges.

**4. SAME—LIEN—PRIORITY AGAINST WAREHOUSEMAN.**
> The lien of a chattel mortgage, as well as the lien of a warehouseman, is a common-law lien, and is therefore not postponed to the warehouseman's lien, where the mortgaged goods are stored with the warehouseman without the mortgagee's consent.

Appeal from ninth district court.

Action by Samuel Baumann against Edward S. Post. There was a judgment for plaintiff, and defendant appeals. Laws N. Y. 1885, c. 526, § 1, (4 Rev. St., 8th Ed., p. 2519,) provides that "a warehouseman, or person lawfully engaged exclusively in the business of storing goods, wares, and merchandise for hire, shall have a lien for his storage charges, for moneys advanced by him for cartage, labor, weighing, and coopering paid on goods deposited and stored with him, and such lien shall extend to and include all legal demands for storage, and said above-described expenses paid which he may have against the owner of said goods; and it shall be lawful for him to detain said goods until such lien is paid."

Argued before BOOKSTAVER and ALLEN, JJ.

*Charles Stewart Davidson, Louis F. Post, Charles P. Easton,* and *Henry C. Andrews,* for appellant. *J. C. Wolff,* for respondent.

BOOKSTAVER, J. The action was brought to recover the possession of furniture claimed by the plaintiff under two certain chattel mortgages, on which the defendant claimed a lien as a warehouseman. The judgment was based upon an agreed statement of facts, from which it appears that the plaintiff, a furniture dealer, on or about the 14th of December, 1888, sold and delivered to one Helen Funk all the furniture in question, except one barrel-head couch, for the sum of $329.59. Of this amount she paid $40 in cash, and agreed to pay the remainder in installments of $20 on the 7th of each month thereafter until all was paid. To secure such payments, she executed and delivered to the plaintiff a chattel mortgage on the furniture so purchased. By the terms of this mortgage it was provided that in case of default in the payment of the whole sum therein mentioned, or any part thereof, or of either or any of the installments, or in case any attempt should be made to remove, or secrete, or sell or dispose of the goods or any of them from the house mentioned in the mortgage without the written consent of the plaintiff first obtained, then the whole amount expressed in the mortgage, less the amount already paid, should become due and payable, without demand, and if the sum so becoming due was not paid, it was provided that the plaintiff might take the goods wherever they were, and sell the same at public or private sale, to reimburse himself, etc. The barrel-head couch was purchased of the plaintiff by Helen Funk on the 22d of December, 1888, for $49.50, on which she paid $1, and agreed to pay the sum of $10 on the 8th of January, 1889, and the remainder on demand, to secure the payment of which she gave the plaintiff a chattel mortgage containing the same provisions as to the removal, etc., as were in the first-mentioned mortgage. A true copy of the first of these mortgages was filed in the register's office on the 18th December, 1888, and a true copy of the second on the 14th day of January, 1889. Copies of both of these mortgages, together with a written statement indorsed on each, exhibiting the interest of the plaintiff in the property covered by each, was filed in the register's office within one year after the first filing, and there is no dispute but that these renewals were according to the statute in such case provided. On the 3d January, 1890, Mrs. Funk had paid the plaintiff, on account of the first mortgage, including the cash payment of $40 at the time of the purchase,

the sum of $154.30 only, leaving an unpaid balance of $180.20, and consequently she had made default in the payment of the installments as they became due, to the amount of $100 and upwards, or, in other words, was in arrears for more than five months' payments. She had never paid anything on account of the second mortgage, and consequently was in default on that mortgage to the amount of $10, agreed to be paid on the 8th of January, 1889. On the 2d of January, 1890, Mrs. Funk, without the knowledge of the plaintiff and without his consent, caused all of the property in controversy to be removed from the house where she had agreed it should be kept, to defendant's storage warehouse, No. 1354 Broadway. Defendant then was, and for a long time before had been, a warehouseman, engaged in that business exclusively. Plaintiff did not learn of the removal and storage of the furniture in question until the 1st of February, 1890. On the 3d of that month he demanded the same both from Mrs. Funk and the defendant. The former refused to deliver the goods to plaintiff, and the latter also refused so to do, unless his bill for storage was first paid.

On this state of facts, the appellant contends that he, as a warehouseman, has a lien upon the furniture in controversy for storage, as against the respondent, (the mortgagee,) and that the court below erred in awarding the possession of the property to the latter, without first paying the storage bill. Several counsel were heard on behalf of the appellant, but none of them claimed there was any defect or weakness in the chattel mortgages on which the respondent relies for his title. Neither is it claimed they were fraudulent. They were duly executed for a valuable consideration; were properly filed; the refiling was within the time required by law; and the statement of the interest of the mortgagee was according to law. The validity of such mortgages has been frequently adjudicated. The giving of them passed the title of the goods in controversy to the mortgagee, subject to be defeated by the performance of their conditions. Default in the payments of the installments is not disputed, and this, as well as the removal of the property from the house in which it was when mortgaged, without the mortgagee's consent, made the whole amount remaining unpaid due at once, and the respondent's title and right to immediate possession absolute. Both the default and the removal occurred before the goods came into appellant's possession as a warehouseman, and consequently respondent's title was perfect before a warehouseman's lien could by any possibility attach to them; hence appellant is driven to the necessity of maintaining one of two propositions,—either that his lien is superior to any other person's right whatever, whether owner or mortgagee, after default, or that the mortgagor in default, being in possession of the mortgaged property, in some sense represents the owner as bailee or agent, and can bind him.

The first of these propositions is based upon the claim that chapter 526 of the Laws of 1885 gave a warehouseman a specific lien for the storage of goods deposited with him against the goods themselves, no matter by whom deposited, and no matter who the owner might be. And the appellant cites in support of this contention *Stallman* v. *Kimberley*, 6 N. Y. Supp. 706, affirmed by the court of appeals, 121 N. Y. 393.[1] But an examination of this case shows that the only question considered was whether this law was intended to give a warehouseman not only specific lien on the goods then in store for warehousing and advances of freight against those goods, but also a general lien for cartage, labor, weighing, and coopering done by the warehouseman on other goods belonging to the owner which had been previously withdrawn. In the course of the opinion rendered by the general term of the supreme court, several authorities were cited to show that a warehouseman had a specific lien at common law before the passage of the act, at least for warehousing and

[1] 24 N. E. Rep. 939.

freight charges, in order to show that the law was not intended to give specific lien only, but also a general lien; and there is nothing whatever in it, or in the opinion of the court of appeals, to show any question like the present was considered. The only point for determination in that case was whether warehousemen had a lien, not only for the charges against the specific goods stored, but also a general lien for a balance due on general account on other goods. The question now under consideration could not have been decided in that case, because there there was no question but that the same persons were the owners of all the goods stored. The act itself shows that it was intended to reaffirm the common law giving a specific lien for specific charges against specific goods, and also a general lien as stated above. There is nothing in it which in my opinion is intended to give a warehouseman a lien upon goods belonging to another, stored by a stranger in fraud of the true owner's rights. If such were the intention of the act, then a thief storing goods could create a lien on them as against a real owner, and to the extent of such a lien could divest him of his right to his own property. To hold such a proposition would make a warehouseman a legalized receiver of stolen goods, at least to the extent of such charges.

The second proposition, I think, is equally untenable. In *Sraights* v. *Hawley*, 39 N. Y. 441, it was held that where a mortgagor of chattels, in possession of them, after default in payment of the mortgage debt, fraudulently delivered them to a third person for sale, and that person, as agent for the mortgagor, sold the chattels, and paid the proceeds to him, the third person was liable to the mortgagee for the value of the chattels, notwithstanding he acted, in making the sale, without reward, without knowledge of the mortgage, and in good faith. And this, I think, is conclusive of the argument advanced by the appellant, that the mortgagee, by allowing the premises to remain in possession of the property after default in the payment of the installments, made him the agent of the latter so as to bind him for storage. Besides, there is no evidence in this case to show that the appellants, at the time of receiving the goods, had any actual knowledge of the existence of the mortgages in question, or that the mortgagor had been in possession of the property for a year or a day after default. He was not misled into trusting to a long-continued possession; for it does not appear that he ever saw or heard of the property until the mortgagor came to him to have it stored. No one contends that the delay in taking possession of the property after default was in any sense fraudulent; it was merely such indulgence as tradesmen naturally give their customers. To hold that reasonable indulgence shall deprive the mortgagee of his security, would be to compel him by law to be harsh and exacting in all cases, by taking possession of the mortgaged property at the earliest opportunity.

But, again, chattels are not like mercantile paper, bank-bills, money, etc. The mere possession of the former does not import assurance of title or authority to dispose of them, as is the case with the latter. There must be something more than mere possession; something giving such possession a specific character, indicative of authority or control. The possession in this case imported no more to the appellant than it would have done had the furniture been hired with the apartments, or loaned to the mortgagor. If the mortgagor, instead of storing the property after default, had sold it, it could not be contended that the purchaser, although honest in his intentions, and ignorant of the mortgage, would have acquired any title to the property as against the respondent. And why? Because such a person would not have been a purchaser in good faith without notice. The law regards the filing of the mortgage as notice to all the world, and he who neglects to inquire at the proper office does so at his peril. If this is true of a purchaser for value, why should it not apply to warehousemen? To this appellant attempts several replies:

1. That chapter 526, Laws 1885, gives a warehouseman this specific lien, even where the goods were stored by a stranger and not the true owner. This, I think, has already been sufficiently answered in considering appellant's first general proposition. In addition to what was then said, it may be remarked that appellant, in his argument, is forced to the position that while a specific lien attaches to the goods without regard to ownership, yet the general lien could only attach to those goods, provided the general account was against the true owner. And hence follows the anomaly that while no search in the proper office would be required for the specific lien, yet such a search would be necessary for the general lien, if the warehouseman desired to enforce it against the true owner, and I fail to perceive why the legislature should make this distinction.

2. That the warehouseman's lien is a common-law lien, and has precedence of a statutory lien. This assumes that a chattel mortgage is a mere statutory lien, which is not the fact. Chattel mortgages were recognized at common law, and the statute only intervenes to declare that such a security shall not be good as against subsequent purchasers and mortgagees in good faith unless the mortgage or a true copy thereof shall be filed in the office designated by law. They are, therefore, both upon equality, and the lien which is first obtained must have precedence.

3. The neglect of the mortgagee to take possession of the chattels after default in the payment of the installments, which it is claimed the mortgagor held as the agent or bailee of the mortgagee so as to bind him. But, as already shown, this is not well founded.

4. The storage being for the security and protection of the chattels, it was for the benefit of the mortgagee as well as of the mortgagor to store them, and therefore the lien should attach. In answer to this, it is sufficient to say that the mortgagor did not store them for the benefit of the mortgagee, but for her own benefit. It is not shown that the storage of the goods was necessary for their preservation. On the other hand, the mortgage itself expressly provided that they should not be removed from the place where they were when mortgaged. It was the mortgagor's duty, if she had no further use for the goods, and desired them to be removed from those premises, to notify the mortgagee of that fact, so as to give him an opportunity to take care of them. In face of the stipulation, it was a fraud upon his rights to attempt to remove them without his written consent.

*Lastly.* That a warehouseman's lien for storage should take precedence of a prior chattel mortgage as a matter of public policy. Questions of policy are for the legislature to determine, and not the courts. They are to be taken into consideration by courts only when the law is doubtful, and the question of policy may aid in elucidating it. In this case I do not think there is any such doubtful question to be determined. But, even if there were, the considerations against allowing such a lien to be created by a stranger to the property are at least as strong as those in favor of it. Warehouses are doubtless a great public convenience, but security of title to property is paramount to that. The inconvenience of requiring a warehouseman to make search in the proper office for chattel mortgages before taking property for storage is not greater than it is to a person buying them, and it is safe to say that the purchasers of goods exceed warehousemen by a thousand fold. All the cases cited by the appellant rest upon the idea that the mortgagee prior in point of time, in some way, expressly or by implication, consented to the mortgagor storing or making repairs to the goods, or is estopped from questioning it. But none of them are applicable to this case, and it is unnecessary to point out the differences in detail. It may, however, be proper to more particularly refer to one or two of the authorities cited. In *Scott* v. *Delahunt*, 65 N. Y. 128, a shipwright had raised and repaired a canal-boat sunk while in use by the mortgagor. The boat being still in his possession, he brought an action to foreclose his lien

for the repairs. It was shown that the mortgagee had knowledge of the making of the repairs while they were in progress, and did not object, and the action was sustained upon the express ground that the mortgagee had knowledge and had impliedly consented to such repairs. *Hammond* v. *Danielson*, 126 Mass. 294, was a case of the mortgage of a hack let for hire by the mortgagor, and described in the mortgage as "now in use." In the mortgage it was stipulated that the mortgagor might retain possession and use it. The defendant claimed a lien on it for repairs. The court regarded it as the manifest intention of the parties that the hack should continue to be driven for hire, and, to this end, kept in a proper state of repair, not merely for the benefit of the mortgagor, but for that of the mortgagee, thereby preserving the value of the security, and affording means to earn the money to pay off the mortgaged debt. No such question arises in this case. In the subsequent case of *Storms* v. *Smith*, 137 Mass. 201, the same court held that a claim for storage of mortgaged property was not a lien upon it, even though the mortgagee was informed of the storing, and expressed no disapproval. Appellant contends that a warehouseman's lien is analogous to that of a common carrier or an innkeeper, but he is mistaken in this, because a warehouseman is not bound to receive every article offered to him for storage. He has, as the carrier and innkeeper have not, a right of selection both of person and of property, and need take only those goods, and from such persons, as he chooses; and hence there is no reason why he should not take the ordinary precautions that others having the same right of choice are bound to do. It has been held (*Bissell* v. *Pearce*, 28 N. Y. 252; *Jackson* v. *Kasseall*, 30 Hun 231) that a livery stable keeper's lien was subordinate to a prior mortgage, so far as the charges before the time of giving notice to the mortgagor are concerned, and arises only when such notice has been given. I think this is the proper rule to be applied to this case, although no notice is provided by the statute. It is clearly unfair to bind the mortgagee until he has had such notice, and in some way acquiesces in the mortgage. In my opinion, therefore, the judgment appealed from should be affirmed, with costs.